IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

DELBERT GASKINS, and          )
ARNOLD WHITE,                 )
                              )
          Plaintiffs,         )
                              )
     v.                       )     CIVIL ACTION NO. 02-1832
                              )
                              )
BFI WASTE SERVICES, LLC,      )
                              )
          Defendant.          )

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant's Motion for a New Trial and Judgment as a Matter of Law.  This race discrimination case went to trial by jury in December 2004. Plaintiffs allege that their employer, BFI Waste Services, LLC ("BFI") subjected them to a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. 1981 ("Section 1981").  The jury awarded each plaintiff a total of $600,000 in compensatory damages - $300,000 each for violations of Title VII and Section 1981.  The jury also awarded each plaintiff $2 million dollars in punitive damages.

*Questions Before the Court*

(1) Whether the Court should grant Defendant's motion for a new trial because Plaintiffs' double recovery for compensatory damages is statutorily impermissible.

(2) Whether the Court should grant Defendant's motion for a new trial because Plaintiffs' award of $2 million dollars each in

punitive damages constitutes double recovery.

(3) Whether the jury unreasonably concluded that BFI did not satisfy the affirmative defense, and therefore, the Court should grant Defendant's motion for judgment as a matter of law or, in the alternative, whether there was sufficient evidence with respect to the affirmative defense to conclude that the Court should grant Defendant's motion for a new trial.

(4) Whether the Court should grant Defendant's motion for a new trial or, in the alternative, for judgment as a matter of law on punitive damages because of the United States Supreme Court's holding in *Kolstad v. American Dental Association*, 527 U.S. 526 (1999), that punitive damages are limited to cases in which "the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'"

(5) Whether the Court should deny Defendant's motion for a new trial based on the "severe or pervasive" jury instruction.

(6) Whether the Court should grant Defendant's motion for a new trial on the grounds that the Court's rulings during jury selection that Defendant's strike of Ms. Sheila Perkins violated the Equal Protection Clause while Plaintiffs' strike of Mr. Rolland Watenpaugh was not prejudicial to BFI.

(7) Whether the Court should grant Defendant's motion for a new trial on the grounds that BFI's motions *in limine* to strike witnesses not previously identified, to exclude certain lay opinion testimony, and to exclude evidence relating to events

2

occurring after December 31, 2003 were denied and BFI was prejudiced by those rulings.

(8) Whether the Court should grant Defendant's motion for a new trial or, in the alternative, remittitur because the compensatory damages awarded to Plaintiffs are not supported by the evidence and are excessive.

(9) Whether the Court should grant Defendant's motion for a new trial, or in the alternative, remittitur because the punitive damages awarded to Plaintiffs are not supported by the evidence and are excessive.

*The Court's Rulings*

(1) The Court holds that permitting Plaintiffs to recover under both Title VII and Section 1981 is not permissible under 42 U.S.C. § 1981a(a)(1)("Section 1981"), and therefore, Plaintiffs may only recover the $300,000 awarded under Section 1981.

(2) The Court denies Defendant's motion for a new trial on punitive damages because the jury instructions and verdict form for punitive damages fairly addressed the issue of punitive damages and the amount awarded by the jury does not constitute double recovery.

(3) The Court denies both the judgment as a matter of law and the motion for a new trial on the basis of the affirmative defense because the jury made non-reviewable factual determinations when it found that the defendant did not exercise reasonable care to prevent or correct harassing behavior and, therefore, did not

satisfy either the first or second element of the affirmative defense.

(4) The Court denies Defendant's motion for a new trial or, in the alternative, for judgment as a matter of law on the submission of punitive damages to the jury based on *Kolstad*, because the jury's finding that BFI did not make good faith efforts to comply with Title VII was a triable issue that the Court may not review when answering Defendant's motion for judgment as a matter of law and was not against clear weight of the evidence.

(5) The Court denies Defendant's motion for a new trial based on the "severe or pervasive" jury instruction because the Court's jury instruction properly instructed the jury that it must find that the Defendant's conduct was sufficiently "severe and pervasive" to create a hostile work environment.

(6) The Court denies Defendant's motion for a new trial on the grounds of *Batson* violations because the plaintiffs' reason for striking Mr. Watenpaugh was not pretextual and Defendant's reason for striking Ms. Perkins was pretextual.

(7) The Court denies Defendant's motion for a new trial based on the denial of several of Defendant's motions *in limine* because the evidentiary issues were properly resolved by the Court in accordance with the Federal Rules of Evidence and BFI was not unfairly prejudiced by the Court's rulings.

(8) The Court denies Defendant's motion for a new trial and declines to award remittitur for the compensatory damages because

the Court holds that Plaintiffs are only entitled to compensatory damages of $300,000 each and these damages are supported by the evidence and are not excessive.

(9) The Court will grant remittitur of the punitive damages and reduce the award of $2 million dollars for each Plaintiff to $600,000 for each Plaintiff because, based on the evidence and compared to the award of compensatory damages, the punitive damages awarded by the jury are excessive.


## I.   BACKGROUND

Plaintiffs Delbert Gaskins and Arnold White, who are African-American, are employed as "roll-off" drivers for Defendant BFI Waste Services ("Defendant," "BFI").  Plaintiffs' jobs consist of picking up refuse containers, emptying the containers at BFI refuse sites, and returning the containers to BFI customers.  Plaintiffs brought a suit against BFI raising claims of racial discrimination in employment under Title VII, 42 U.S.C. §§ 2000e *et seq.*, and under Section 1981.  In the Complaint, Plaintiffs alleged that they were subjected to discriminatory treatment in compensation and that the supervisors frequent use of derogatory terms toward black employees created a hostile work environment.  This Court granted summary judgment in each of the cases.  The Fourth Circuit affirmed the grants of summary judgment with respect to the claims of discrimination in compensation but reversed with respect to the appellants' hostile work environment claims.  The plaintiffs' cases were consolidated

and the case went to trial in December 2004.  The jury found in favor of the plaintiffs on their hostile work environment claims.

The jury awarded each Plaintiff compensatory damages of $300,000 under both Title VII and Section 1981 for a total of $600,000 each.  The jury also awarded punitive damages of $2 million dollars to each Plaintiff, resulting in each Plaintiff being awarded a total of $2.6 million dollars.


## II.  DISCUSSION

### A.  Standard of Review

*Motion for Judgment as a Matter of Law*

Federal Rule of Civil Procedure 50(b) allows parties to renew a motion for judgment after trial, or in the alternative, to seek a motion for a new trial.  *Id.*  The moving party must first make a motion for judgment as a matter of law prior to the case being submitted to the jury. *See* FED. R. CIV. P. 50(a)-(b).  "If a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture, judgment as a matter of law must be entered."  *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005) (citing *Crinkley v. Holiday Inns, Inc.,* 844 F.2d 156, 160 (4th Cir. 1988)).  If, however, the evidence is susceptible to more than one "reasonable inference, a jury issue is created and a motion for judgment as a matter of law should be denied."  *See Myrick,* 395 F.3d at 490 (citing *Hopherr v. Dart Indus. Inc.,* 853 F.2d

259, 261-62 (4th Cir. 1988)).  The jury verdict must stand "[i]f there is evidence on which a reasonable jury could return a verdict in favor of the nonmoving party." *Lovell v. BBNT Solutions, LLC*, 295 F. Supp. 2d 611, 617 (E.D.Va. 2003).  In making this determination, the Court must review the evidence in the light most favorable to the non-moving party.  *See Myrick*, 395 F.3d at 490 (citing *Hofherr,* 853 F.2d at 261-62).


*Motion for a New Trial*

A motion for a new trial is governed by Federal Rule of Civil Procedure 59.  On a Rule 59 motion, a district court may set aside the jury's verdict and grant a new trial only if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Lovell*, 295 F. Supp. 2d at 618 (citing *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587, 594 (4th Cir. 1996)).  A court is permitted to consider the credibility of witnesses in determining the clear weight of the evidence.  *Id.* (citing *Knussman v. Maryland,* 272 F.3d 625, 647 (4th Cir. 2001)).


*Remittitur*

If a court concludes that a verdict is excessive, "it is the court's duty to require a remittitur or order a new trial." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998)

(internal citations omitted).  There is no specific provision for remittitur under the Federal Rules of Civil Procedure, but it is well established that a remittitur should be ordered when a jury award will result in a miscarriage of justice.  *Id.*; *see also Robles v. Prince George's County, Maryland*, 302 F.3d 262, 272 (4th Cir. 2002); *G. M. Garrett Realty, Inc. v. Century 21 Real Estate Corp.*, 17 Fed. Appx. 169, 172-73 (4th Cir. 2001).  Under the practice of remittitur, "the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award."  *Cline*, 144 F.3d at 305.  The decision as to whether damages are excessive is "entrusted to the sound discretion of the district court."  *Robles*, 302 F.3d at 271.

## B.  Analysis

The Court holds that a new trial is not warranted under Rule 59, and the jury's judgment should not be altered under Rule 50 of the Federal Rules of Procedure.  The Court, however, finds that recovery under both Title VII and Section 1981 is not permissible under Section 1981a, and therefore, Plaintiffs' compensatory damages are reduced to $300,000 each under Section 1981.  Furthermore, the Court holds that, based on Fourth Circuit precedent, the punitive damages awarded by this jury are excessive and, therefore, the Court grants remittitur of the punitive damages award to $600,000 to each Plaintiff.

*Verdict for Compensatory Damages*

Permitting the plaintiffs to recover under both Title VII and Section 1981 was error and therefore Plaintiff's recovery for compensatory damages must be reduced by $300,000.  The law permits recovery of compensatory and punitive damages under Title VII only if the Plaintiff "cannot recover under section 1981." 42 U.S.C. § 1981a(a)(1).  This statutory language aims to prevent double recovery for a claim that is valid under both statutes. *See Bradshaw v. Univ. of Maine Sys.*, 870 F. Supp. 406, 407 (D.Me. 1994) (discussing legislative history of Section 1981a). Accordingly, Plaintiffs may not recover compensatory damages under both Title VII and Section 1981.  *Lowery v. Circuit City Stores*, *Inc.*, 206 F.3d 431, 441 (4th Cir. 2000); see also, *Dunning v. Gen. Elec. Co.*, 892 F. Supp. 1424 (M.D.Al. 1995) (Section 1981a precludes double recovery under Title VII and Section 1981).

In this case, the jury awarded each Plaintiff compensatory damages of $300,000 under both Title VII and Section 1981.  This Court erred by allowing Plaintiffs to recover under both statutes, a result expressly prohibited under Section 1981a. Accordingly, the Plaintiffs may only recover compensatory damages of $300,000 under Section 1981 and may not recover the compensatory damages awarded by the jury under Title VII, because this would constitute double recovery as prohibited by Section 1981a.

*Verdict for Punitive Damages*

Plaintiffs' award of $2 million dollars each in punitive damages does not constitute double recovery.  Defendants argue that the verdict form submitted to the jury on punitive damages was improper because it contained no preliminary question on BFI's liability and because there was no distinction drawn between damages awarded under Title VII and Section 1981.  In this case, the jury was properly instructed on punitive damages.  In fact, the jury was given three instructions on punitive damages.  *See* Final Jury Instructions 23, 16, 11.  The jury was instructed that "[p]unitive damages are discretionary and need not be awarded" and that "Plaintiffs are not entitled to punitive damages as a matter of right."  Final Jury Instruction 23, 16.  The jurors were further instructed that they "may award punitive damages if Plaintiffs have shown by clear and convincing evidence that BFI engaged in harassment with actual malice or reckless indifference to Plaintiffs' right to be free from a hostile work environment."  Final Jury Instruction 16.  In determining punitive damages, the jury was instructed to consider all relevant factors, including:

1.  The impact or severity of defendant's conduct.
2.  The amount of time defendant BFI Waste Services, LLC conducted itself in this manner.
3.  The amount of compensatory damages.
4.  The potential profits defendant BFI Waste Services, LLC may have made from defendant's conduct.
5.  The attitudes and actions of defendant's top management after the misconduct was discovered.
6.  The effect of the damages award on defendant's financial condition.

Final Jury Instruction 23. The jury was further instructed that

an award of punitive damages should be:

> 1.  In an amount that will deter the Defendant and others from similar conduct.
> 2.  Proportionate to the wrongfulness of the Defendant's conduct and the Defendant's ability to pay.
> 3. But not assigned to bankrupt or financially destroy the Defendant.

Final Jury Instruction 16. Furthermore, the verdict form for punitive damages asked the jury to indicate whether or not it elected to award punitive damages for each Plaintiff and to indicate the amount.  There is nothing to suggest that the jury was confused or that the punitive damages they awarded were duplicative.  The Court finds that the jury instructions and the jury verdict form for punitive damages fairly addressed the issue of punitive damages.  Therefore, the Court denies Defendant's motion for judgment as a matter of law, or in the alternative, the motion for a new trial with respect to the jury instructions and verdict form for punitive damages.

*The Ellerth/Faragher Affirmative Defense*

Defendant BFI cannot escape liability by using the affirmative defense established in *Ellerth* and *Faragher* because Defendant did not present sufficient evidence that (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities the employer provided or to otherwise avoid harm.  *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

The issues before the Court are whether the jury unreasonably concluded that BFI did not satisfy the affirmative defense and, therefore, the Court should grant Defendant's motion for judgment as a matter of law, or in the alternative, whether there was sufficient evidence with respect to the affirmative defense to conclude that the Court should grant Defendant's motion for a new trial.  With regards to both the motion for judgment as a matter of law and the motion for a new trial, the Court gives deference to the jury verdict because a federal court may not "substitute its judgment for that of a jury, as long as the jury operated within the constraints of the law and the evidence."  *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 99 (4th Cir. 1991); *see also* U.S. CONST. amend VII ("[T]"he right to trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States").

*Defendant Does Not Satisfy the Affirmative Defense Requirements Under the Standard of Review Appropriate for Judgment as a Matter of Law*

The Court denies Defendant's motion for judgment as a matter of law under the affirmative defense because the jury made non-reviewable factual determinations when it found that Defendant did not exercise reasonable care to prevent or correct harassing behavior, and therefore, did not satisfy either the first or second element of the affirmative defense.  When ruling on a motion for judgment as a matter of law, the court may not weigh the evidence or assess the credibility of the witnesses.  *Tools*

12

*USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 657 (4th Cir. 1996); *Whalen v. Roanoke County Bd. of Supervisors*, 769 F.2d 221, 226 (4th Cir. 1985).   The Fourth Circuit recognized that there was an issue of material fact concerning whether BFI enforced its anti-harassment policy effectively when it remanded the case in 2004.   *White v. BFI Waste Services*, 375 F.3d 288, 299-300 (4th Cir. 2004).   Defendant attempts to show that the Fourth Circuit would not have found a factual dispute in its 2004 remand if it had seen all the evidence the jury saw at trial.   Def.'s Reply Supp. Mot. J. Matter Law at 6 (hereinafter "Def.'s Matter of Law Reply" ).   This assertion fails because the parties also presented conflicting evidence as to Defendant's response to Plaintiffs' complaints at trial.   For example, Mr. Norwood Sloane testified that BFI never took any steps to rectify the plaintiffs' complaints of racial harassment.   Tr. Test. of Norwood Sloane at 17 (hereinafter "Sloane Test.").   By contrast, Mr. Conrad Mehan testified that after Mr. Sloane filed complaints of racial harassment with Mr. Mehan on behalf of himself and Plaintiffs, Mr. Mehan counseled two supervisors about treating BFI's employees respectfully.   Tr. Test. of Conrad Mehan at 31-32 (hereinafter "Mehan Test.").   Because there was conflicting evidence, the jury's finding that Defendant did not satisfy the first element of the affirmative defense was a triable issue that the Court may not review when answering Defendant's motion for judgment as a matter of law.   *Tools USA*, 87 F.3d at 657; *Whalen*,

769 F.2d at 226.

The jury's determination as to the second prong of the affirmative defense was also a triable issue of fact that the Court cannot review.  The second prong requires a plaintiff employee to reasonably avail him or herself of the employer's preventive or remedial apparatus.  *Faragher*, 524 U.S. at 806. The jury concluded according to the evidence of Mr. Sloane's complaint to BFI management about the racial harassment by BFI supervisors that Plaintiffs made "concerted efforts to inform the employer that a problem exist[ed]."  *Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 269 (4th Cir. 2001); Sloane Test. at 10-11. Defendant asserts that it satisfied the affirmative defense because Plaintiffs failed to complain about the harassment for years on end.  Def.'s Matter of Law Reply at 8.  However, the dates of the harassment and the complaints are fact-based determinations that the Court cannot review when deciding whether Defendant deserves judgment as a matter of law.  *Tools USA*, 87 F.3d at 657; *Whalen*, 769 F.2d at 226.  Therefore, the Court denies Defendant's motion for judgment as a matter of law with regard to both the first and second prongs of the affirmative defense.

*Defendant Does Not Satisfy the Affirmative Defense Requirements Under the Standard of Review Appropriate for a Motion for a New Trial*

The Court also denies Defendant's motion for a new trial

because the evidence was sufficient for the jury to reasonably conclude that Defendant did not satisfy the first element or the second element of the affirmative defense.  When ruling on a motion for a new trial, the Court weighs the evidence and assesses witness credibility.  *Whalen*, 769 F.2d at 226.  The Court evaluates the evidence in the light most favorable to Plaintiffs because they are the non-moving party.  *Herold v. Hajoca Corp.*, 864 F.2d 317, 319 (4th Cir. 1988).  The Court finds that there was sufficient evidence for the jury to reasonably conclude that BFI failed to satisfy the first prong of the affirmative defense.  BFI asserts that there was "undisputed evidence . . . that BFI had anti-discrimination and anti-harassment policies, distributed them to employees, and posted them in the drivers' room."  Def's. Mot. New Trial at 19.  This assertion fails, however, because there was insufficient evidence of a reasonably effectual policy.  Though Defendant asserted at trial that it had an anti-discrimination policy, it failed to introduce any evidence that the policy was carried out with reasonable care.  Mr. Conrad Mehan testified that the policy was in a handbook, posted for employees to see, and explained during training classes.  Mehan's Test. at 6-7.  Merely having a policy, however, does not establish the first element of the affirmative defense dispositively, even if the employer made employees aware of the policy.  *See Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999)("...mere promulgation of such a policy may well fail to satisfy the employer's burden.  The employer must act reasonably,

and thus any policy adopted by the employer must be both reasonably designed and reasonably effectual"). The employer must also exercise reasonable care when designing and carrying out the policy. *Id.* The jury reasonably could have found from the evidence that BFI did not carry out its alleged anti-harassment policy with reasonable care. Mr. Sloane testified that after he complained about the harassment, management would give "some kind of excuse" and then the employee "would come back a week later with the same kinds of complaints or a month later with the same kinds of complaints." Sloane Test. at 11. This evidence is sufficient for the jury to conclude that Defendant failed to respond reasonably to Plaintiffs harassment complaints. Therefore, the jury reasonably concluded that Defendant did not satisfy the first element of the affirmative defense because there was sufficient evidence that Defendant did not reasonably implement an anti-harassment policy.

Moreover, the Court finds that the evidence was sufficient for the jury to find that Defendant did not satisfy the second element of the affirmative defense. Defendant asserts that it satisfies the second element because Plaintiffs waited an unreasonably long period of time to file their harassment complaint. Def.'s Motion New Trial at 20. However, Plaintiffs presented evidence that, although there was no formal process for reporting racial harassment, they went to their union representative before the union was set up in 2001. Mehan Test. at 8, 17, 25. Furthermore, there was evidence that Plaintiffs

16

feared retaliation for complaining about harassment because the supervisors made threatening statements to them.  Because there was evidence of Plaintiffs' timely complaints and of a fear of retaliation, the jury reasonably could have concluded that Defendant did not satisfy the second prong of the affirmative defense.

Additionally, even if the Court accepted, for argument's sake, Defendant's assertion that Plaintiffs did not timely complain, Defendant still fails the second prong of the affirmative defense because it had constructive notice of the harassment, and therefore, should have acted to remedy the supervisors' behavior.  Relying on a Ninth Circuit case, Defendant asserts that it did not act with "malice or reckless indifference" with regard to the harassment complaints.  *See Swinton v. Potomac Corp.*, 270 F.3d 794, 810 (9th Cir. 2001) (*cert. denied*).  The correct standard for evaluating employer behavior to determine if the employer had constructive notice of the harassment such that it should have corrected the behavior, however, is whether the employer "knew or should have known" the harassment was occurring.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002); *Ellerth*, 524 U.S. at 759.  An employer "knew or should have known" of the behavior where the harassment was sufficiently severe or pervasive.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998); *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1016 (8th Cir. 1988).  Defendant asserts that it was only aware of the supervisors using the term "boy" and,

17

therefore, the harassment was not sufficiently severe or pervasive to constitute constructive notice.  Def.'s Mot. New Trial at 22.  However, the Plaintiffs and their witnesses presented testimony that BFI supervisors frequently and openly used the odious terms like "nigger," "zulu warrior," "porch monkey," "porch nigger," "mighty joe young," and "jiggaboo" over the course of several years.  This language constitutes severe racial harassment, and its occurrence over several years makes it sufficiently pervasive.  Additionally, there was evidence of a petition circulating among BFI truck drivers that alleged the supervisors at BFI were racist and were using racial slurs.  The jury reasonably could have concluded based on this evidence, that the harassment was sufficiently severe and pervasive that Defendant "knew or should have known" of the harassment and taken steps to remedy it.  Because the jury reasonably concluded from the evidence that Defendant established neither the first nor the second prong of the affirmative defense, the Court denies Defendant's motion for a new trial based on the affirmative defense.

*Submission of Punitive Damages to the Jury*

The submission of punitive damages to the jury in this case was supported by the evidence and therefore was appropriate.  In *Kolstad*, the Court held that punitive damages are limited to cases in which "the employer has engaged in intentional discrimination and has done so 'with malice or with reckless

indifference to the federally protected rights of an aggrieved individual.'" *Kolstad v. American Dental Association*, 527 U.S. 526, 529-30 (1999) (citing 42 U.S.C. § 1981a(b)(1)).  Employers are not liable for punitive damages in employment cases if the misconduct in question was contrary to the employer's good faith efforts to comply with the law.  *Id*. at 544.  Specifically, "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employers good faith efforts to comply with Title VII."  *Id*. at 545 (internal citations omitted).

BFI asserts that a new trial should be ordered for punitive damages because it made good faith efforts to comply with Title VII.  BFI contends that it published anti-discrimination policies, posted them in the break room, had a toll-free hotline, trained its employees about the policies, and conducted reasonable investigations when complaints were made.  Def.'s Mot. New Trial at 6.  However, the Court finds that there was sufficient evidence for the jury to conclude that BFI did not make a good faith effort to comply with Title VII.  BFI asserts that it "conducted reasonable investigations when complaints were made."  Def.'s Mot. New Trial at 6.  However, at trial the parties presented conflicting evidence as to BFI's response to Plaintiffs' complaints.  For example, Mr. Norwood Sloane testified that BFI never took any steps to rectify the plaintiffs' complaints of racial harassment.  Sloane Test. at 17. In contrast, Mr. Conrad Mehan testified that after Mr. Sloane

filed complaints of racial harassment with Mr. Mehan on behalf of himself and Plaintiffs, Mr. Mehan counseled two supervisors about treating BFI employees respectfully. Mehan Test. at 31-32.

Conflicting evidence regarding what steps, if any, BFI took to address complaints of racial harassment, the jury's finding that BFI did not make good faith efforts to comply with Title VII was a triable issue that the Court may not review when answering Defendant's motion for judgment as a matter of law. *Tools USA*, 87 F.3d at 657; *Whalen*, 769 F.2d at 226. Furthermore, the jury's finding was not against the clear weight of the evidence. Accordingly, the Court denies Defendant's motion for judgment as a matter of law and motion for a new trial with respect to the submission of punitive damages to the jury.

*Severe or Pervasive Jury Instruction*

The Court denies Defendant's motion for a new trial based on the "severe or persuasive" jury instruction. The Supreme Court repeatedly has held that a hostile work environment is actionable only if the harassment was "severe or pervasive." *See, e.g.*, *Faragher*, 524 U.S. at 775, 787, 788. The jury instruction given by the Court in this case, stated that to establish the existence of a racially hostile work environment, the plaintiffs must prove, by a preponderance of the evidence, that "the conduct was sufficiently *severe and pervasive* to alter the conditions of the plaintiffs' employment and create a racially abusive or hostile work environment." Final Jury Instruction 17 (emphasis added).

Defendants assert that it was material error not to give its proposed jury instructions which more specifically defined "severe and pervasive." Def.'s Mot. New Trial at 10.

The standard of review for determining whether the district court should have given a jury instruction is abuse of discretion. *United States v. Ruhe*, 191 F.3d 376, 384 (4th Cir. 1999) (citing *United States v. Abbas*, 74 F.3d 506, 513 (4th Cir. 1996)). "The test of the adequacy of jury instructions is whether the jury charge, construed as a whole, adequately states the controlling legal principle without misleading or confusing the jury." *Chaudhry v. Gallerizzo*, 174 F.3d 394, 408 (4th Cir. 1999). A refusal to give a requested jury instruction is only reversible error if the instruction

> (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense.

*United States v. Patterson*, 150 F.3d 382, 388 (4th Cir. 1998). In this case, the given jury instruction stated that the jury must find that the plaintiffs proved the alleged conduct was sufficiently "severe and pervasive" to create a hostile work environment. The Court's instruction sufficiently covered the elements required for the jury to find the existence of a racially hostile work environment. Accordingly, the Court denies Defendant's motion for a new trial based on the "severe or persuasive" jury instruction.

*Certain Rulings*

 *Rulings During Jury Selection*

  The Court denies Defendant's motion for a new trial on the grounds that the Court's rulings during jury selection were prejudicial to BFI because Defendant's strike of Ms. Sheila Perkins violated the Equal Protection Clause while Plaintiffs' strike of Mr. Rolland Watenpaugh did not.  When considering a motion for a new trial, the Court evaluates the evidence in the light most favorable to the non-moving party, here, the plaintiffs.  *Herold v. Hajoca Corp.*, 864 F.2d 317, 319 (4th Cir. 1988).  Additionally, a reviewing court will not overturn the trial judge's ruling concerning the constitutionality of peremptory strikes unless the ruling is clearly erroneous. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *United States v. Mitchell*, 877 F.2d 294, 303 (4th Cir. 1989).

  A litigant striking a potential juror (hereinafter "striking party") solely on account of the juror's race or due to an assumption that jurors of a particular race will be unable, as a group, to consider the case impartially violates the Equal Protection Clause.  *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 631 (1991); *Batson*, 476 U.S. at 89;  *Mitchell*, 878 F.2d at 302.  A striking party violates *Batson* when the party challenging the strike (hereinafter "challenging party") can establish a prima facie case of purposeful discrimination and can rebut any neutral explanation for the strike that the striking party presents.  *J.E.B. v. Alabama*, 511 U.S. 127, 145 (1994); *Batson*,

476 U.S. at 96; *Allen v. Lee*, 319 F.3d 645, 652 (4th Cir. 2003).

The challenging party establishes a prima facie case if (1) the

challenging party is a member of a cognizable racial group; (2)

the striking party used its challenges to remove members of the

challenging party's race from the venire; and (3) other facts and

circumstances surrounding the proceeding raise an inference that

the striking party discriminated in its use of peremptory

challenges.  *Batson*, 476 U.S. at 96; *Allen*, 319 F.3d at 652-53.

Once the challenging party makes a prima facie showing, the

burden shifts to the striking party to present a neutral, non-

discriminatory reason other than race on which it based its

challenge.  *J.E.B.*, 511 U.S. at 145; *Hernandez v. New York*, 500

U.S. 352, 360 (1991); *Batson*, 476 U.S. at 97; *Allen*, 319 F.3d at

653.  The neutral explanation need not rise to the level of a

"for cause" challenge.  *J.E.B.*, 511 U.S. at 145; *Batson*, 476 U.S.

at 97; *Allen*, 319 F.3d at 653.  However, the explanation must not

be pretextual.  *J.E.B*, 511 U.S. at 145; *Hernandez*, 500 U.S. at

363.

> *The Court Properly Denied Defendant's Peremptory Strike of Juror Sheila Perkins*

Defendant's strike of African-American juror Sheila Perkins

failed the *Batson* test because its explanation was pretextual.

Defendant asserts that Plaintiffs failed to establish a prima

facie case of purposeful discrimination.  Def.'s Mot. New Trial

at 14.  However, Plaintiffs did establish a prima facie case.

Plaintiffs satisfied the first element because Plaintiffs were

both African-American.  *Batson*, 476 U.S. at 96; *Allen*, 319 F.3d at 652; Pls.' Opp'n. to Def.'s Mot. For a New Trial at 14 (hereinafter "Pls.' Opp'n. at 14").  Plaintiffs established the second element because Ms. Perkins was of the same race as the plaintiffs.  *Batson*, 476 U.S. at 96; *Allen*, 319 F.3d at 652.

Plaintiffs also satisfied the third element of the prima facie case because the totality of the circumstances surrounding the proceeding raised an inference that the striking party discriminated when striking Ms. Perkins.  *Batson*, 476 U.S. at 96; *Allen*, 319 F.3d at 652-53.  Ms. Perkins was an African-American woman and the entire case centered around alleged severe race discrimination against African-Americans, including the alleged use of extremely offensive terms over the course of years.  Additionally, Defendant based its explanation for striking Ms. Perkins on an issue not before the Court, namely union relationships.  However, Defendant presented nothing about union membership or voting in pleadings, briefs, or issues before trial.  Further, the Fourth Circuit's remand opinion makes no mention of unions.  These circumstances lead to the reasonable conclusion that Defendant was striking Ms. Perkins for a discriminatory reason.  Therefore, Plaintiffs satisfied all three elements of a prima facie *Batson* case.

Defendant's explanation for striking Ms. Perkins due to the bad management/union relationship at her company was pretextual.  Def.'s Mot. New Trial at 14.  A reviewing court must accord great deference to a trial judge's determination regarding whether or

not the striking party's explanation is a pretext for discrimination. *Batson*, 476 U.S. at 97; *Richardson v. Boddie-Noell Enter., Inc.*, 78 Fed. Appx. 883, 887 (4th Cir. 2003); *Davis v. Baltimore Gas & Elec. Co.*, 160 F.3d 1023, 1026-27 (4th Cir. 1998). BFI argues that the union/management relationship of Ms. Perkins' company was relevant because BFI's defense emphasized that its employees filed discrimination complaints following a union plan to make African-American workers feel insecure about their jobs and therefore vote for the union. Def.'s Mot. New Trial at 14. Plaintiffs point out, however, that not one defense witness alluded to any such alleged union ploy or raised the issue of union votes. Pls.' Opp'n. at 15. Additionally, Mr. Sloane's testimony indicated that BFI employees complained of racial harassment before formation of the union. Sloane Test. at 5. Further, the Court reasonably determined that Defendant's explanation was pretextual because Defendant had presented nothing concerning a union membership or voting issue at that point in the trial. Therefore, viewing the evidence in the light most favorable to Plaintiffs and giving substantial deference to the Court's decision at trial, the Court concludes that Defendant's explanation for striking Ms. Perkins was pretextual and the Court properly allowed her to sit on the jury.

   *The Court Properly Granted Plaintiffs' Peremptory*
   *Strike of Rolland Watenpaugh*

   The Court did not apply the *Batson* test erroneously when it found that Plaintiffs' reason for striking Caucasian juror Mr.

Rolland Watenpaugh was a neutral, non-discriminatory explanation. Defendant asserts that Plaintiffs defended their strike of Mr. Watenpaugh by saying he worked as a manager and that explanation was pretextual because Plaintiffs failed to strike an African-American juror, Mr. Leslie Allen, who was also a manager. Def.'s Mot. for New Trial at 15. However, "*Batson* is not violated when two veniremen of different races provide the same responses and one is excused and the other is not." *Matthews v. Evatt*, 105 F.3d 907, 918 (4th Cir. 1997). Additionally, Plaintiffs offered a further nondiscriminatory reason for striking Mr. Watenpaugh and not striking Ms. Allen, namely that Mr. Watenpaugh had been a manager for much longer than Ms. Allen. Therefore, viewing the evidence in the light most favorable to Plaintiffs and giving substantial deference to the Court's decision at trial, the Court concludes that Plaintiffs' explanation for striking Mr. Watenpaugh was not pretextual and the Court properly allowed Plaintiffs to strike him from the jury. Accordingly, the Court denies Defendant's motion for a new trial on the grounds of *Batson* violations because the Court's findings that Plaintiffs' reason for striking Mr. Watenpaugh was not pretextual and Defendant's reason for striking Ms. Perkins was pretextual were not erroneous.

*Defendant's Motions In Limine*

The Court denies Defendant's motion for a new trial on the grounds that BFI's motions *in limine* to strike witnesses not

previously identified, to exclude certain lay opinion testimony, and to exclude evidence relating to events occurring after December 31, 2003 were denied pre-trial.  "Rulings related to admission and exclusion of evidence are addressed to the sound discretion of the trial judge and will not be reversed absent an abuse of that discretion."  *United States v. Bostian*, 59 F.3d 474, 480 (4th Cir. 1995).  The Court stands on its reasoning, articulated in open court and in its earlier orders, as to the proper logic under the Federal Rules of Evidence on various evidentiary issues between the parties.  The Court will not expound on these issues in this Opinion, as they were addressed in prior rulings on the parties Motions *in limine*.

*Remittitur*

   *Compensatory Damages*

   In this case, the compensatory damages of $300,000 for each Plaintiff are supported by the evidence and are not excessive. For the reasons explained above, the Court holds that Plaintiffs are only entitled to compensatory damages of $300,000 each under Section 1981, as awarded by the jury.  The plaintiffs may not recover the compensatory damages awarded by the jury under Title VII, because this would constitute double recovery which is statutorily prohibited.  42 U.S.C. § 1981a(a)(1).  In reviewing awards for compensatory damages, the factual record is compared to the verdict "to determine compatibility." *Cline*, 144 F.3d at 305.  If a court determines the jury's verdict is against the

weight of the evidence or based on false evidence, the court should reduce the award.  *Id.*

Defendant argues that Plaintiffs' verdict for compensatory damages was excessive because Plaintiffs did not submit testimony of any physicians or other medical professionals to support a finding of any medical condition resulting from Defendant's actions.  This argument must fail.  Based on the totality of the evidence, it is reasonable that the jury could conclude that Plaintiffs suffered severe emotional distress.  Mr. Gaskins and Mr. White both testified in detail about the pain, the personal humiliation, and the suffering and mental anguish they experienced as a result of Defendant's unlawful actions.  Furthermore, Mr. White testified that as a result of the racial discrimination he suffered at BFI, he had to see a doctor for help.  Tr. Test. of Arnold White at 95-96 (hereinafter "White Test.").  During the trial, Plaintiffs gave compelling testimony detailing the racial discrimination they endured over the course of many years and the severe emotional distress that it caused.

A number of studies show that experiences of racial discrimination can induce physiological and psychological reactions that can have a negative effect on both physical and mental health status.  Tyrone A. Forman, *Social Psychological Costs of Racial Segmentation in the Workplace: A Study of African Americans' Well Being*, 44 J. HEALTH AND SOCIAL BEHAVIOR 332 (Sept. 2003); Jules P. Harrell, et al., *Physiological Responses to Racism and Discrimination; An Assessment of the Evidence*, 93

AMER. J. PUBLIC HEALTH (Feb. 2003); David R. Williams & Ruth Williams-Morris, *Racism and Mental Health: the African American Experience*, 5(3/4) ETHNICITY & HEALTH 243 (2000).  In this case, Mr. Gaskins and Mr. White both testified that the severe racial discrimination they suffered at the hands of BFI supervisors over the course of many years had a significantly negative impact on their mental health.  For example, Mr. Gaskins described the stress caused by the BFI's supervisors constant discrimination "like putting up with a cancer eating inside of you, day and night."  White Test. at 84.  The evidence presented at trial clearly supports a finding that the racism that Mr. White and Mr. Gaskins experienced at BFI had a detrimental effect on their mental health.

In *Hetzel*, the Fourth Circuit cited the fact that the Plaintiff never sought the aid of a therapist as one of the reasons for reversing and remanding the damages award.  Hetzel, 89 F.3d at 171.  Racial and ethnic minorities, however, in the United States are less likely than whites to seek mental health treatment.  OFFICE OF THE SURGEON GENERAL, U.S. DEP'T OF HEATH AND HUMAN SERVICES, Mental Health: A Report of the Surgeon General, Culture, Race Ethnicity Supplement 28 (1999).  Furthermore, current research suggests that African-Americans are often misdiagnosed by mental health professionals.  See Joe Feagin, *et. al.*, The Many Costs of Discrimination: The Case of the Middle-Class African Americans, 34 IND. L. REV. 1313, 1338 (2001).  When African Americans are victims of severe racial discrimination,

such as the plaintiffs in this case, they have a tradition of turning for aid to significant others in the community, especially family, friends, neighbors, voluntary associations, and religious figures.  This strategy has evolved from the historical African-American experience of having to rely on each other, often for their very survival.  *Id.* at 1340; OFFICE OF THE SURGEON GENERAL, U.S. DEP'T OF HEATH AND HUMAN SERVICES, Mental Health, Culture, Race and Ethnicity (2001).  In this case, Plaintiffs did not present any physical evidence of psychological or psychiatric evaluations, but both Plaintiffs testified that they turned to family as a coping mechanism.  The evidence presented at trial in this case was sufficient to establish the severe negative effects of the racial discrimination on Mr. Gaskins and Mr. White, and therefore, supports the jury damage award of compensatory damages.

The Fourth Circuit has held that "a plaintiff's testimony, standing alone can support an award of compensatory damages for emotional distress." *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 546 (4th Cir. 2003) (citing *Price v. City of Charlotte*, 93 F.3d 1241, 1251 (4th Cir. 1996)).  Furthermore, the Fourth Circuit has held that physical symptoms of emotional distress are not a prerequisite for an award of compensatory damages.  *Cline*, 144 F.3d at 306.  Thus, the Court finds that the testimony of Mr. White and Mr. Gaskins regarding their emotional distress is sufficient to support the jury award of compensatory damages in the amount of $300,000 each.  And accordingly, the Court holds

that the jury award for compensatory damages of $300,000 for a violation of Title VII is appropriate.


*Punitive Damages*

The Court will reduce the jury award of $2 million dollars for each Plaintiff in punitive damages to $600,000 for each Plaintiff, because the damages are excessive based on the evidence and compared to the award for compensatory damages. Punitive damages, unlike compensatory damages, are not designed to redress the loss of the plaintiff, but instead are aimed at deterrence and retribution. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).

To date, however, the Fourth Circuit has been unclear in its employment discrimination jurisprudence on how district courts should weigh evidence and create reasonable damages awards for successful plaintiffs. In fact, the Fourth Circuit has ruled on a succession of cases where the awards have been too high by pointing to some factors that might be relevant to a court's analysis, but it has not enumerated any specific formula providing the district courts more guidance. The following is a brief summary of some of the controlling damages awards cases from the Fourth Circuit:

In *Hetzel v. County of Prince William*, the plaintiff, a Hispanic female police officer, brought suit under Title VII and 42 U.S.C. § 1983 ("Section 1983") asserting claims of harassment

31

and discrimination on the basis of sex and national origin.  89 F.3d 169 (4th Cir. 1996).  The plaintiff alleged that she had been denied requests to transfer, was passed over for promotion without justification, had been subject to abusive treatment, suffered disparate disciplinary treatment and received unwarranted poor performance reviews culminating with a 1995 Internal Affairs investigation.  *Id.* at 171.

At trial, the plaintiff testified that she had endured headaches and had problems interacting with her family as a result of the defendant's actions.  *Id.*  The trial court upheld the jury's award of $500,000 in compensatory damages for the plaintiff's emotional distress, stating that the verdict was supported by the evidence, especially where Hetzel was crying and shaking throughout the trial.  *Id.*

On appeal, the Fourth Circuit reversed and remanded the damages award stating that the amount of evidence presented by the plaintiff would entitle her only to a minimal damages award. *Id.* The Fourth Circuit's determination was based on the fact that the plaintiff's case rested largely on her own self-serving testimony, the fact that she never sought the aid of a therapist, and the fact that her trauma was primarily the result of her incorrect perception that she was being discriminated against. *Id.*  On remand, this Court recalculated the damages award to $15,000.

In *Cline*, the Fourth Circuit addressed the reasonableness of a damages award in the context of a Americans with Disabilities

32

Act of 1990 ("ADA") and Family Medical Leave Act of 1993 ("FMLA").
144 F.3d 294. (4th Cir. 1998). Six months after undergoing brain
surgery, for a brain tumor, the plaintiff, Keith Cline, began
working as a night maintenance worker for Wal-Mart in
Harrisonburg, Virginia.  Cline received satisfactory performance
reviews while serving in that position, and approximately one
year later the store manager promoted him to the position of
night maintenance supervisor and gave him a pay raise.  *Id.*

Soon after his promotion, Cline was diagnosed with another
brain tumor.  He advised Wal-Mart's store manager that he needed
to take a medical leave in order to have surgery.  *Id.*  Cline
discussed his leave options with Wal-Mart's personnel manager,
but at no time was he apprised of his rights under the FMLA.  *Id.*
Prior to Cline's FMLA leave expiring, Wal-Mart's store manager
contacted an employee from another store about the possibility of
taking over Cline's supervisory position, expressing concerns
that Cline would no longer have the mental capacity to do the
job.  *Id.* at 99.

Three months after his leave began, Cline returned to work
with no medical restrictions, and within several hours, was
demoted to the position of night maintenance worker.  144 F.3d at
299.  Both Cline and Cline's wife contacted Wal-Mart's management
personnel to complain about his demotion.  *Id.*  Wal-Mart district
manager Randy Metje informed Mrs. Cline that her husband had been
demoted due to Cline's supervisor's assertions that his health
problems would not allow him to work more than two days a week

and that he could no longer handle the stress of the supervisory position. *Id.*

Two months after returning to work from his medical leave, Cline arrived at work to attend a mandatory meeting of the night maintenance crew scheduled by the new supervisor. *Id.* The supervisor had given strict instructions to clock in and wait for the meeting in the employee lounge, which Cline and another employee did. *Id.* When the store manager observed the two men waiting in the employee lounge having already clocked in, he fired them on the spot for attempting to clock in early and defraud the company.[1]

Cline brought suit alleging unwarranted demotion and termination in violation of the ADA and the FMLA for failure to initially reinstate him to his previous supervisory position, and that under state law his termination was void as public policy. *Id.* at 299-300. The jury returned a verdict for Cline and awarded $117,500 in compensatory damages and $182,500 in punitive damages for the ADA claim. *Id.* at 300.

On appeal, the Fourth Circuit held that the jury's compensatory award of $117,500 was excessive as against the weight of the evidence and instructed the district court to set an outer limit of $10,000 for compensatory damages. *Id.* at 305-

---

[1] Though Wal-Mart claimed to have fired both men, the company could not produce any documentation at trial that the other employee had been terminated or disciplined in any other fashion. At any rate, the other employee was reinstated within two weeks of his alleged firing at his original wage and was eventually promoted to night maintenance crew supervisor.

06.  The Fourth Circuit reasoned that, though there was evidence that Cline had suffered some emotional distress, there was no evidence that the trauma persisted over time or affected his ability to do his job.  *Id.*  The court again pointed to the fact that the plaintiff had not sought professional help for his emotional distress as a compelling factor in limiting damages.  *Id.*  The Fourth Circuit also found the jury's punitive damages award to be excessive.  The Court provided little to no reasoning in determining that a $50,000 outer limit would be a sufficient deterrent to Wal-Mart acting in a similar fashion in the future.  *Id.* at 306-07.

In 2001, the Fourth Circuit took the opportunity to review a damages award in FMLA and Section 1983 claim brought by a male state police employee in *Knussman*.  272 F.3d 625 (4th Cir. 2001).  In 1994, the plaintiff, Officer Howard Knussman, a trooper in the Maryland State Police ("MSP"), attempted to take four to eight weeks of paid sick leave in order to care for his wife who was going through a difficult pregnancy.  *Id.* at 628.  Knussman initially received word from a superior that it would be impossible for him to take more than two weeks of leave.  *Id.*  Knussman's superior also told him incorrectly that the FMLA did not entitle him to more than two weeks paid leave and that any additional time off would have to be unpaid leave.  *Id.*

Knussman later attempted to secure leave under a new Maryland statutory provision which allowed for "primary care givers" of newborns to use up to thirty days of accrued sick

35

leave to care for his family through a manager of the MSP Personnel Management Division. *Id.* At that time, the personnel manager informed Knussman that only birth mothers could classify as "primary care givers" under the statute and consequently Knussman was awarded ten days of leave. *Id.* at 629. After the birth of his child, Knussman's wife experienced continued health problems and the plaintiff again sought out "primary care giver" status, this time through one of his supervisors, which would have entitled him to an additional twenty days of leave under the Maryland statute. *Id.* That request was denied by the assistant division commander and passed down to Knussman through the chain of command. *Id.*

Knussman made one more attempt to secure additional leave through another of his supervisors, but again was denied by the manager of the MSP Personnel Management Division, who stated that his wife would have to be "in a coma or dead" for him to qualify as the "primary care giver" under the statute. *Id.* at 630. Following this final denial of leave, Knussman filed an administrative grievance claiming that he had been improperly denied primary care giver status. *Id.* Knussman's grievance was denied at all four stages of the formal complaint procedure. Thereafter, he filed claims alleging gender discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment under Section 1983 and violation of the FMLA for denial of his leave requests. *Id.* at 631. The jury awarded Knussman $375,000 in compensatory damages for emotional injuries under

36

Section 1983.  *Id.* at 639.

On appeal, the Fourth Circuit again set aside the jury award of damages on the grounds that evidence of the emotional stress did not support the amount of the award.  *Id.* at 642.  Unlike previous cases, Knussman did in fact seek out and receive treatment from a psychologist for loss of sleep, anxiety and chest pains related to his emotional distress.  *Id.* at 640.  The court, however, reasoned that the majority of Knussman's stress stemmed from the grievance and litigation process itself and not from the constitutional deprivation.  Consequently, the case was remanded to the district court for a recalculation of the damages.  *Id.* at 642.  On remand, the parties agreed to a bench trial on damages based on the initial record and the court reduced the damages award to $40,000.  *Knussman v. State of Maryland*, 73 Fed. Appx. 608, 612 (4th Cir. 2003).

In 2003, the Fourth Circuit reviewed the damages award in a hostile environment sex discrimination case with some particularly disturbing facts in *Ocheltree v. Scollon Products, Inc.* 335 F.3d 325.  Plaintiff, Lisa Ocheltree, was the only female worker in the production shop of Scollon Products working alongside ten to twelve men.  *Id.* at 328.  During her first year, the atmosphere was initially friendly but quickly devolved into a tirade of graphic and offensive sexual talk that steadily increased in frequency.  *Id.*  Some of her coworkers fondled a female mannequin in the production shop in a suggestive fashion in her presence or engaged in mock sexual acts including oral sex

with it.  *Id.*  On one occasion, Ocheltree's coworkers brought her a book containing pictures of men with pierced genitalia and asked her what she thought of it while the other men in the room laughed.  *Id.*  Ocheltree repeatedly asked her coworkers to stop making jokes of that nature and complained on several occasions to her supervisor about her coworkers' conduct, but her supervisor found the daily onslaught to be funny.  *Id.*

Ocheltree made several attempts to bring her concerns to the president and senior-vice president of Scollon, the other two management level employees at her company other than her supervisor.  She was repeatedly rebuffed and her concerns went unaddressed.  *Id.* at 329.  Furthermore, her supervisor often prevented her from seeking out Scollon's officers' help by telling her to return to her work station if she left the room when the sex-related talk began to get out of hand.  *Id.* at 330. When Ocheltree had no success voicing her concerns through the appropriate process, she made a statement at a production shop safety meeting that all of the offensive behavior should stop, but her plea had no lasting effect.  *Id.*

Ocheltree filed suit alleging sex discrimination and retaliation claims under Title VII.  *Id.*  The jury awarded her $7280 in compensatory damages and $400,000 in punitive damages. *Id.*  The district court reduced the amount of punitive damages to $42,720 bringing the total damages in line with the statutory cap imposed for awards against companies with 101 or fewer employees. *Id.*  On appeal, the Fourth Circuit, despite evidence that

Scollon's officers repeatedly ignored the plaintiff's attempts to speak with them, held that while there was evidence to support a damages award of some kind, there was not sufficient evidence that the employer acted with the requisite malice or reckless indifference to support a finding of federal law violation. Consequently, the court found, without much discussion, that the punitive damages award was unwarranted and set it aside altogether.

*Guideposts for Review of Punitive Damage Awards*

To help courts review punitive damage awards, the Supreme Court has provided three guideposts:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm*, 538 U.S. at 418.  The Supreme Court has instructed:

> [i]t should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.

*Id*.  The Court has also indicated that, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."  *Id*. at 426.  To determine a defendant's reprehensibility, the most important indicium of a punitive damages award's reasonableness - a court must consider whether:

(1) the harm was physical rather than economic; (2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) the conduct involved repeated actions or was an isolated incident; (4) the harm resulted from intentional malice, trickery, or deceit, or mere accident. *BMW of N. Am. v. Gore*, 517 U.S. 559, 576-77 (1996).

In the instant case, the guideposts articulated by the Supreme Court and the Fourth Circuit indicate that, although a significant punitive damages award is warranted, the jury's award of $2 million dollars for each Plaintiff is excessive and an award of $600,000 in punitive damages for each Plaintiff is appropriate.

*Reprehensibility*

In evaluating the constitutionality of the punitive damages awards in this case the Court must consider the degree of reprehensibility of the BFI supervisors' conduct.  As the Supreme Court stated, "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."  *BMW*, 517 U.S. at 575.  In *BMW*, the Supreme Court outlined what one court has termed an "hierarchy of reprehensibility" with acts and threats of violence being at the top, "followed by acts taken in reckless disregard for others' health and safety, affirmative acts of trickery and deceit, and finally, acts of omission and mere negligence." *Florez v. Delbovo*, 939 F. Supp. 1341, 1348-49 (N.D.Ill. 1996) (citing BMW, 517 U.S. at 575-76).  The

40

defendants' behavior in this case did not rise to the level of violence or threat of violence, the worst kind of tortious conduct that a defendant can commit.  However, intentional discrimination is a different kind of harm, a serious affront to personal liberty. *See Romano v. U-Haul Int'l Inc.*, 233 F.3d 655, 673 (1st Cir. 2000).

The jury found, and the evidence clearly leads a reasonable juror to believe, that BFI supervisors created a racially hostile work environment in violation of Title VII through their frequent harassing comments and pervasive use of racially derogatory terms.  In *White v. BFI Waste Serv.*, the Fourth Circuit stated, "[f]ar more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African-Americans.  'Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.'"  *White*, 375 F.3d at 298 (citing *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)) (citation and internal quotation marks omitted).  As one court stated in regards to the word "nigger," "[n]o word in the English language is as odious or loaded with as terrible a history." *Daso v. The Grafton Sch., Inc.*, 181 F. Supp. 2d 485, 493 (D.Md. 2002).  During trial, Mr. White and Mr. Gaskins testified that, throughout their employment at BFI, supervisors repeatedly called them and other black employees derogatory terms including, "boy," "jigaboo," "nigger," "porch monkey," "spear-chucker" and "Zulu

41

Warrior." *See, e.g.*, White Test. at 82, 84, 86-87, 112; Gaskins
Test. 133, 137, 149, 151-53.  Mr. White stated that Mr. Tom
Germaine, his immediate supervisor from 1989 to 1995, would make
comments such as, "'[y]ou do what the hell I tell you to do, you
little porch monkey.'" and "'[a]ny time I tell you to do
something, nigger you do it.  If you don't, I'll fix you.
Remember you ain't nothing to me.'"  White Test. at 82.  Mr.
White also testified that Mr. Rick Rottenberry, another
supervisor at BFI, stated "'[y]ou ain't nothing but a nigger,"
but 'boy,' 'little porch monkey.' 'Let me tell you something, you
little porch monkey, you do what I tell you to do.  Look at your
size.  You're a Zulu warrior.  You're an African Man.  You're...a
spear-chucker."  White Test. at 87.  Furthermore, Mr. Gaskins
testified that he was consistently harassed about having a white
wife.  See Gaskins Test. 147.  The jury also heard testimony from
Mr. Jay Smith, a supervisor at the BFI Merrifield facility,
regarding the comments he made to Mr. Gaskins about his wife
being white and his disdain for interracial dating.  Tr. Test. of
Jay Smith at 50.  The evidence of the pervasive use of racial
slurs and derogatory comments by BFI supervisors over the course
of many years, and in the presence of others, was sufficient to
support the jury finding that BFI created a racially hostile work
environment.

Racial discrimination has resulted in some large punitive
damage awards. *See, e.g., Hampton v. Dillard Dep't Stores, Inc.*,
247 F.3d 1091, 1116 (10th Cir. 2001) (finding that conduct of

department store that suspected two African-American women of
shoplifting and detained them briefly on basis of their race was
sufficiently reprehensible to support jury award of $1.1
million); *Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001)
(finding employer's toleration of racial slurs and the
termination of an employee to be sufficiently reprehensible to
support $1 million dollar jury award).  In this case, the facts
demonstrate that the discrimination inflicted upon Plaintiffs
over the course of many years is sufficiently reprehensible to
support a substantial punitive damages award.

Plaintiffs testified that the racially motivated verbal
abuse had a negative effect on their relationships with their
wives and children.  Specifically, Mr. White testified that the
pervasive racial discrimination caused him to go through "stress
and strain" and this resulted in him "yelling and being abusive"
to his three children and his wife over the course of fourteen
years.  White Test. at 100.  He testified this behavior changed
his life to such an extent that he felt he had literally lost
those years with his family.  *See id*.  Similarly, Mr. Gaskins,
who has twelve children, testified that the discrimination he
endured at BFI's Merrifield facility affected his attitude so
negatively that his children were "scared to come to me in the
evening.  Their daddy wasn't coming home.  It was a monster
coming home."  Gaskins Test. at 142.

Discriminatory comments can have a more severe impact if
they are made in the presence of others, such as the victims' co-

workers, family, or friends.  *See EEOC v. R&R Ventures*, 244 F.3d
334, 340 (4th Cir. 2001) (noting that supervisor made
discriminatory comments "in front of other employees and
customers and, in doing so, made his victims uncomfortable and
visibly upset"); *Smith v. Northwest Fin. Acceptance*, 129 F.3d
1408, 1414 (10th Cir. 1997) (finding that because discriminatory
comments were made in presence of Plaintiff's co-workers they
were more humiliating and more severe than if they were made in a
private setting).  In this case, the derogatory comments were
made in the presence of others, including Plaintiff's co-workers
at BFI.  *See* White Test. at 106; Gaskins Test. at 153; Tr. Test.
of Monique Sharp at 9.  Furthermore, Mr. White testified that a
BFI supervisor made discriminatory remarks in front of his wife
and children at a company picnic.  White Test. at 87-88.
Specifically, Mr. White stated that at the company picnic, as he
was getting out of a Toyota Forerunner with his wife and two
children, Mr. Jay Smith stated "Hey, boy, you make too much
money.  I'm going to have to cut you back...because the color of
your skin you make too much money.*"  Id.*  The fact that the
racially discriminatory statements were made in a public setting
increases the severity of their effect on Plaintiffs, and
therefore, is one factor contributing to the reprehensibility of
the conduct.  The racial discriminatory conduct of the BFI
supervisors was sufficiently reprehensible to support a punitive
damages award of $600,000 for each plaintiff.

*Ratio*

Another important consideration in assessing the
constitutionality of the award in this case is the ratio of
punitive damages to compensatory damages.  "In most cases, the
ratio will be within a constitutionally acceptable range, and
remittitur will not be justified on this basis."  BMW, 517 U.S.
at 573.  The Supreme Court has declined to give a precise
numerical guideline to define the "constitutionally acceptable
range" but has struck down punitive damages awards that involved
very large ratios of punitive damages to compensatory damages.
For example, in *BMW* the ratio was a "breathtaking 500 to 1"and
in *State Farm* the ratio was 145 to one.  *Id*.; *State Farm*, 538
U.S. at 583.

In this case, the ratio of the punitive damages award, which
has been reduced by the Court to $600,000, to the compensatory
damages award, which has been reduced by the Court to $300,000
award is two to one.  This is a single digit ratio and is far
below the ratios at issue in the Supreme Court cases of *BMW* and
*State Farm*.  In *State Farm* the Court stated that "[s]ingle-digit
multipliers are more likely to comport with due process" than the
extreme ratios found in cases like *BMW* or *State Farm*.  *State
Farm*, 538 U.S. at 425.  The ratio in this case of two to one is
certainly not constitutionally excessive under current case law.

*Civil and Criminal Penalties*

The third guidepost that should be considered is "the
difference between this remedy [punitive damages] and the civil

45

penalties authorized or imposed in comparable cases." BMW, 517 U.S. at 575. There are no federal civil fines or criminal penalties for the conduct in question in the instant case. Section 1981a caps Title VII awards at $300,000. This cap gives some indication of Congress' judgment regarding appropriate awards under Title VII. *Florez v. Delbovo*, 939 F. Supp. 1341, 1348 (N.D.Ill. 1996). However, there are no caps on damages under 42 U.S.C. § 1981. *See Kim v. Nash Finch Co.*, 123 F.3d 1046, 1067 (8th Cir. 1997) ("the Title VII statutory cap does not apply to limit the recovery under 42 U.S.C. § 1981."). This factor weighs in favor of remittitur and supports the finding by this Court that the punitive damages award should be reduced to $600,000.

In light of the severe degree of reprehensibility, the ratio of compensatory damages to punitive damages, the civil penalties available, as well as the juries' consideration of BFIs' financial assets, Defendant's discriminatory actions in violation of Title VII are sufficiently wrong to justify a significant award of punitive damages. Nevertheless, an award of $2 million dollars is excessive and represents a miscarriage of justice. In this case, the degree of reprehensibility of the BFI supervisors' conduct and the resulting ratio of two to one for compensatory damages to punitive damages support a reduction of the punitive damages award to $600,000 to each Plaintiff. Accordingly, the Court reduces the amount of the punitive damages award to $600,000 for each Plaintiff.  _____

### III.   CONCLUSION

For the foregoing reasons, it is hereby,

ORDERED that Defendant's Motion for a Judgment as a Matter of Law is DENIED.

It is further ORDERED that Defendant's Motion for a New Trial is DENIED IN PART and GRANTED IN PART.  The compensatory damages will be reduced to $300,000 for each Plaintiff. Plaintiff is given the option of accepting the reduced punitive damages of $600,000 or accepting a new trial on the issue of damages for the hostile work environment.

The Clerk is directed to forward a copy of this Order to counsel of record.

ENTERED this __17th_____day of June, 2005.

____/s/_____

Gerald Bruce Lee
United States District Judge

Alexandria, Virginia
6/17/05